OPINION OF THE COURT
RENDELL, Circuit Judge.
This matter comes before us on remand from the United States Supreme Court in light of its ruling in F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009). This case, like Fox, involves a tightening of the Federal Communications Commission’s standards for the broadcast of fleeting indecent material. Fox concerned the FCC’s decision to abandon its safe harbor for expletives that are not repeated; this case considers the FCC’s departure from its earlier policy exempting fleeting images from the scope of actionable indecency. While we can understand the Supreme Court’s desire that we re-examine our holdings in light of its opinion in Fox— since both involve the FCC’s policy regarding “fleeting material” — in Part A of this opinion we conclude that, if anything, Fox confirms our previous ruling in this case and that we should readopt our earlier analysis and holding that the Commission acted arbitrarily in this case. See CBS Corp. v. F.C.C., 535 F.3d 167 (3d Cir.2008), vacated by F.C.C. v. CBS Corp., — U.S. —, 129 S.Ct. 2176, 173 L.Ed.2d 1153 (2009). Accordingly, in Part B of this opinion we again set forth our reasoning and conclusion that the FCC failed to acknowledge that its order in this case reflected a policy change and improperly imposed a penalty on CBS for violating a previously unannounced policy. See id. at 188-89. We have reconsidered certain other aspects of our previous opinion and will not remand, but, instead, will rule in Part B that CBS’s petition for review is granted in toto.

Part A: Our Prior Opinion and the Impact of Fox

I.
The treatment of fleeting indecency over the airwaves has been the subject of much *125 consideration by the FCC and the courts over the last thirty years. This case involves a February 1, 2004 incident: the exposure, for nine-sixteenths of one second, of Janet Jackson’s bare right breast during the live halftime performance of the National Football League’s Super Bowl XXXVIII.[1] The FCC issued a forfeiture order against CBS in March 2006, imposing a penalty of $550,000. See In re Complaints Against Various Television Licensees Concerning Their February 1, 2001 Broadcast of the Super Bowl XXXVIII Halftime Show, 21 F.C.C.R. 2760 (2006) (“Forfeiture OrdeV’). We described the FCC’s reasoning in our previous opinion:
Affirming its preliminary findings, the Commission concluded the Halftime Show broadcast was indecent because it depicted a sexual organ and violated “contemporary community standards for the broadcast medium.” Id. at ¶ 10. In making this determination, the FCC relied on a contextual analysis to find the broadcast of Jackson’s exposed breast was: (1) graphic and explicit, (2) shocking and pandering, and (3) fleeting. Id. at ¶ 14. It further concluded that the brevity of the image was outweighed by the other two factors. Id. The standard applied by the Commission is derived from its 2001 policy statement setting forth a two-part test for indecency: (1) “the material must describe or depict sexual or excretory organs or activities,” and (2) it must be “patently offensive as measured by contemporary community standards for the broadcast medium.”
In re Industry Guidance on the Commission’s Case Law Interpreting 18 U.S.C. § lí6í and Enforcement Policies Regarding Broadcast Indecency, 16 F.C.C.R. 7999, 8002 ¶¶7-8 (2001) (emphasis in original)....
Additionally, the FCC determined CBS’s actions in broadcasting the indecent image were “willful” and therefore sanctionable by a monetary forfeiture under 47 U.S.C. § 503(b)(1). See Forfeiture Order at ¶ 15.
CBS Corp., 535 F.3d at 172. CBS sought reconsideration under 47 C.F.R. § 1.106, which the FCC denied. See In re Complaints Against Various Television Licensees Concerning Their February 1, 2001 Broadcast of the Super Bowl XXXVIII Halftime Show, 21 F.C.C.R. 6653 (2006). Neither of these two orders acknowledged, much less explained, any change in the FCC’s enforcement policy for fleeting indecent images.
CBS filed a petition for review in our Court, contending that the FCC’s ruling that the fleeting nude image was actionable indecency constituted a change in policy, and its application to CBS was, therefore, arbitrary and capricious under the Administrative Procedure Act (“APA”), 5 U.S.C. § 706. Specifically, CBS urged that, before the incident in question, FCC policy provided that the “isolated use of expletives in broadcasts did not constitute actionable indecency under 18 U.S.C. § 1464.” CBS Corp., 535 F.3d at 176 (citing See In re Application of Pacifica Found., 95 F.C.C.2d 750, 1983 WL 182971 (1983)).
The FCC defended its actions on the basis that its earlier fleeting-material policy applied only to fleeting utterances and did not extend to fleeting images.[2] We rejected this contention:
*126 During a span of nearly three decades, the Commission frequently declined to find broadcast programming indecent, its restraint punctuated only by a few occasions where programming contained indecent material so pervasive as to amount to “shock treatment” for the audience. Throughout this period, the Commission consistently explained that isolated or fleeting material did not fall within the scope of actionable indecency. At the time the Halftime Show was broadcasted by CBS, the FCC’s policy on fleeting material was still in effect. The FCC contends its restrained policy applied only to fleeting utterances — specifically, fleeting expletives — and did not extend to fleeting images. But a review of the Commission’s enforcement history reveals that its policy on fleeting material was never so limited. The FCC’s present distinction between words and images for purposes of determining indecency represents a departure from its prior policy.
Id. at 174-75.
Reviewing in detail the progression of FCC rulings leading up to the present, we could not find the distinction advocated by the FCC. Indeed, we could only reach the opposite conclusion:
[T]he balance of the evidence weighs heavily against the FCC’s contention that its restrained enforcement policy for fleeting material extended only to fleeting words and not to fleeting images. As detailed, the Commission’s entire regulatory scheme treated broadcasted images and words interchangeably for purposes of determining indecency. Therefore, it follows that the Commission’s exception for fleeting material under that regulatory scheme likewise treated images and words alike. Three decades of FCC action support this conclusion.
Accordingly, we find the FCC’s conclusion on this issue, even as an interpretation of its own policies and precedent, “counter to the evidence before the agency” and “so implausible that it could not be ascribed to a difference in view or the product of agency expertise.”
Id. at 188 (quoting Motor Vehicle Mfrs. Ass’n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).
Thus, we found that the ruling in this case represented a departure from prior policy that required an explanation:
The Commission’s determination that CBS’s broadcast of a nine-sixteenths of one second glimpse of a bare female breast was actionably indecent evidenced the agency’s departure from its prior policy. Its orders constituted the announcement of a policy change — that fleeting images would no longer be excluded from the scope of actionable indecency. ...
[A]n agency cannot ignore a substantial diversion from its prior policies. See Ramaprakash v. FAA, 346 F.3d 1121, 1124 (D.C.Cir.2003) (agency must “provide a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored”). As the Supreme Court explained in State Farm, an agency must be afforded great latitude to change its policies, but it must justify its actions by articulating a reasoned analysis behind the change....
*127 CBS Corp., 535 F.3d at 181-82 (citing State Farm, 463 U.S. at 42-43, 103 S.Ct. 2856).
We then noted that in Fox Television Stations, Inc. v. F.C.C., the United States Court of Appeals for the Second Circuit had analyzed under State Farm the FCC’s change in its fleeting-expletive policy (announced in its Golden Globes order, after the 2004 Halftime Show broadcast at issue here) and had “rejected the agency’s proffered rationale as ‘disconnected from the actual policy implemented by the Commission.’” Id. at 183 (quoting 489 F.3d 444, 459 n. 8 (2d Cir.2007), rev’d, Fox, 129 S.Ct. 1800). We then distinguished the FCC’s actions in Fox from its order in this case:
There, as Judge Leval noted in dissent, the FCC provided an explanation for changing its policy on fleeting expletives. The critical question splitting the court was whether that explanation was adequate under State Farm. Here, unlike in Fox, the FCC has not offered any explanation — reasoned or otherwise— for changing its policy on fleeting images. Rather, the FCC asserts it never had a policy of excluding fleeting images from the scope of actionable indecency, and therefore no policy change occurred when it determined that the Halftime Show’s fleeting image of Janet Jackson’s breast was actionably indecent.
Id. (emphasis added). Because our analysis of three decades of FCC enforcement contradicted the Commission’s assertion in this regard, we concluded that “the FCC’s new policy of including fleeting images within the scope of actionable indecency is arbitrary and capricious under State Farm and the Administrative Procedure Act, and therefore invalid as applied to CBS.” Id. at 189.
We next engaged in a discussion regarding the degree of scienter necessary for the imposition of a forfeiture, and concluded the opinion by remanding to the agency, finding this course of action to be appropriate where the agency has issued an arbitrary decision. See id. at 209.
Eight months later the Supreme Court issued its decision in Fox, on certiorari from the Second Circuit. See Fox, 129 S.Ct. 1800. As noted above, the issue in that case was “the adequacy of the Federal Communications Commission’s explanation of its decision that [the statutory prohibition on indecent language] sometimes forbids the broadcasting of indecent expletives even when the offensive words are not repeated,” not, as here, the question whether the FCC’s order amounted to a policy change.[3] Id. at 1805 (emphasis added).
The Court reviewed the statutory and regulatory background in the introductory section of the opinion, concluding with a discussion of the FCC’s ruling in Golden Globes, where “the Commission took one step further by declaring for the first time that a nonliteral (expletive) use of the F- and S-Words could be actionably indecent, even when the word is used only once,” Fox, 129 S.Ct. at 1807. The Supreme Court observed:
The [Golden Globes ] order acknowledged that “prior Commission and staff *128 action have indicated that isolated or fleeting broadcasts of the ‘F-Word’ ... are not indecent or would not be acted upon.” It explicitly ruled that “any such interpretation is no longer good law.” It “clarified] ... that the mere fact that specific words or phrases are not sustained or repeated does not mandate a finding that material that is otherwise patently offensive to the broadcast medium is not indecent.” Because, however, “existing precedent would have permitted this broadcast,” the Commission determined that “NBC and its affiliates necessarily did not have the requisite notice to justify a penalty.”
Id. at 1808 (internal citations omitted).
The Court next considered the case before it, which involved two instances of celebrities’ use of the “F-Word” in live broadcasts. Id. (discussing Cher’s and Nicole Richie’s statements at two consecutive Billboard Music Awards broadcasts). The Commission had initially issued Notices of Apparent Liability, but imposed no fines. See In re Complaints Regarding Various Television Broadcasts Between February 2, 2002 and March 8, 2005, 21 F.C.C.R. 2664 (2006). In further proceedings, the Commission gave Fox the opportunity to object, then upheld the indecency findings. See In re Complaints Regarding Various Television Broadcasts Between February 2, 2002, and March 8, 2005, 21 F.C.C.R. 13299 (2006) (“Remand Order”). The FCC’s order explained its reason for departing from the position that fleeting expletives were exempt from otherwise applicable indecency standards:
In the Commission’s view, “granting an automatic exemption for ‘isolated or fleeting’ expletives unfairly forces viewers (including children)” to take “ ‘the first blow’ ” and would allow broadcasters “to air expletives at all hours of a day so long as they did so one at a time.”
Fox, 129 S.Ct. at 1809 (internal citations omitted). The FCC appeared to hedge to some degree as to the extent of, and timing of, its change in policy for fleeting material, but, as the Supreme Court noted, it “made clear [that] the Golden Globes Order eliminated any doubt that fleeting expletives could be actionably indecent, and the Commission disavowed the bureau-level decisions and its own dicta that had said otherwise.” Id. (internal citations omitted).
Regarding the adequacy of the FCC’s explanation for its policy change, the Court rejected the Second Circuit’s view that an agency must “make clear ‘why the original reasons for adopting the [displaced] rule or policy are no longer dispositive’ as well as ‘why the new rule effectuates the statute as well as or better than the old rule.’ ” Fox, 129 S.Ct. at 1810 (quoting Fox, 489 F.3d at 456-57) (internal quotations omitted; alteration in original). It held:
To be sure, the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position. An agency may not, for example, depart from a prior policy sub silentio or simply disregard rules that are still on the books. See United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). And of course the agency must show that there are good reasons for the new policy. But it need not demonstrate to a court’s satisfaction that the reasons for the new policy are better than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the con *129 seious change of course adequately indicates.
Id. at 1811.
The Court concluded that, in that case, the Commission’s “reasons for expanding the scope of its enforcement activity were entirely rational”:
It was certainly reasonable to determine that it made no sense to distinguish between literal and nonliteral uses of offensive words, requiring repetitive use to render only the latter indecent. As the Commission said with regard to expletive use of the F-Word, “the word’s power to insult and offend derives from its sexual meaning.” And the Commission’s decision to look at the patent offensiveness of even isolated uses of sexual and excretory words fits with the context-based approach we sanctioned in [F.C.C. v. Pacifica Foundation], 438 U.S. [726], 750, 98 S.Ct. 3026 [57 L.Ed.2d 1073 (1978) ]. Even isolated utterances can be made in “pander[ing,] ... vulgar and shocking” manners, and can constitute harmful “ ‘first blow[s]’ ” to children. It is surely rational (if not inescapable) to believe that a safe harbor for single words would “likely lead to more widespread use of the offensive language.”
Fox, 129 S.Ct. at 1812-13 (internal citations omitted). Notably, the Court’s discussion of the Commission’s action concluded with the following statement: “[T]he agency’s decision not to impose any forfeiture or other sanction precludes any argument that it is arbitrarily punishing parties without notice of the potential consequences of their action.” Id. at 1813.
Accordingly, the Court reversed the Second Circuit’s order and upheld the FCC’s decision.
II.
We must decide the extent to which Fox affects our previous ruling in this case. We conclude that, if anything, the Supreme Court’s decision fortifies our original opinion, in two ways.
For one thing, in Fox, unlike in this case, the FCC acknowledged that its orders had “broken new ground,” as noted above. See 129 S.Ct. at 1812. The Supreme Court specifically noted that the FCC’s “decision not to impose any forfeiture or other sanction” in that case signaled its recognition that assessing penalties based on violations of previously unannounced policies would amount to “arbitrarily punishing parties without notice of the potential consequences of their actions.” Id. at 1813. The same logic implies that the FCC erred in imposing a fine on CBS in this case, as the chronology of events that are the subject of these cases demonstrates.
The FCC Enforcement Bureau’s original, 2003 ruling in Golden Globes applied its then-controlling policy of exempting all fleeting indecent material from enforcement, determining that the singer Bono’s use of the “F-Word” (“this is really, really f- - brilliant”) did “not fall within the scope of the Commission’s indecency prohibition.” CBS Corp., 535 F.3d at 177 (quoting In re Complaints Against Various Broadcast Licensees Regarding Their Airing of the “Golden Globe Aioards” Program, 18 F.C.C.R. 19859, ¶6 (FCC Enforcement Bureau 2003)). But, in March 2004, the full Commission reversed the Enforcement Bureau’s decision, overruling all of its prior cases that held fleeting expletives were not actionable. The Commission declined to impose a penalty on the Golden Globes broadcasters, however, because “ ‘existing precedent would have permitted [the Golden Globe Awards] broadcast’ and therefore it would be ‘inap *130 propriate’ to sanction licensees for conduct prior to notice of policy change.” Id. at 178 (quoting Golden Globes, 19 F.C.C.R. at 4981-82).
The expletive utterances by Cher and Nicole Richie that were considered in Fox took place, respectively, during the 2002 and 2003 Billboard Music Awards telecasts, before the full Commission’s March 2004 Golden Globes decision. Accordingly, and applying the same rationale as in Golden Globes, the FCC declined to impose a fine. As the Fox Court observed and affirmed, the decision not to impose a fine in that case signaled the FCC’s understanding that imposing sanctions for conduct that occurred before the FCC’s policy change was announced would raise due process concerns. See Fox, 129 S.Ct. at 1813.
The same principle applies here. The relevant Halftime Show broadcast occurred in February 2004, preceding the FCC’s ruling in Golden Globes. But despite its earlier consistent policy exempting all fleeting material — words and images — from its indecency rules, see CBS Corp., 535 F.3d at 188, the FCC assessed a fine against CBS. Fox confirms our earlier observation that because the Commission did not announce any change in its fleeting-material policy until March 2004, and because the offensive conduct in this case (like the offending conduct in Golden Globes and Fox) preceded that date, the FCC’s assessment of a forfeiture and imposition of a penalty against CBS constitutes arbitrary, and therefore unlawful, punishment. Fox, 129 S.Ct. at 1813; see also CBS Corp., 535 F.3d at 180-81.
The FCC and our dissenting colleague contend that, in all events, the FCC’s decision in Young Broadcasting of San Francisco, Inc., 19 F.C.C.R. 1751 (2004), issued just days before CBS’s Halftime Show, provided CBS with adequate notice that the FCC might impose a forfeiture for fleeting nude images. But as we pointed out in our earlier opinion, the 2004 Young Broadcasting decision was a non-final notice of apparent liability; “the final disposition of Young Broadcasting was still unresolved” at the time of the Halftime Show broadcast. Id. at 187 & n. 18. The decision therefore reflects only “tentative conclusions” of the FCC, and, in our view, provides insufficient notice of the FCC’s official policy on fleeting nude images, particularly when viewed in the context of the agency’s consistent refusal over three decades to consider such fleeting material indecent, to justify the imposition of sanctions against CBS.
Therefore, we must reaffirm our conclusion that the penalty imposed in this case is arbitrary unless we find, contrary to the extensive analysis in our earlier opinion, that the FCC’s pre-Golden Globes fleeting-material policy did not also apply to fleeting images. But, here again, Fox supports our previous conclusion. The Commission, and our dissenting colleague, point to one small portion of the background section in the Supreme Court’s lengthy Fox opinion as support for the position that the FCC’s fleeting-material policy never applied to images but was always restricted to words. But we discern no such meaning in the relevant passage, which briefly observed:
Although the Commission had expanded its enforcement beyond the “repetitive use of specific words or phrases,” it preserved a distinction between literal and nonliteral (or “expletive”) uses of evocative language. The Commission explained that each literal “description or depiction of sexual or excretory functions must be examined in context to determine whether it is patently offensive,” but that “deliberate and repetitive use ... is a requisite to a finding of *131 indecency” when a complaint focuses solely on the use of nonliteral expletives.
129 S.Ct. at 1807 (quoting In re Pacifica Found., Inc., 2 F.C.C.R. 2698, 2699, ¶ 13 (1987)).
The FCC argues that images fall into the category of literal “descriptions or depictions” of sexual organs or functions, and that the Court’s language indicates that the FCC’s previous fleeting-material policy applied only to non-literal, or expletive, depictions or descriptions, and not, as we previously concluded, to fleeting images as well as expletives. We disagree.
First, we do not see how this summary recitation of the Commission’s opinions affects the reasoning or result in our case. It appears in the Court’s background discussion of the FCC’s historical approach to indecent language, and is neither reasoning nor holding; it is mere characterization. Second, this language narrowly addresses words and phrases, with no discussion of images. Although the phrase “description or depiction,” considered in isolation, could be construed to include images, Justice Scalia is paraphrasing the language of the FCC’s 1987 Pacifica Foundation opinion, involving words alone, in which the complete phrase used by the FCC was “speech involving the description or depiction of sexual or excretory functions.”[4] In re Pacifica Found., Inc., 2 F.C.C.R. 2698, 2699, ¶ 13 (1987), quoted in Fox, 129 S.Ct. at 1807. As the dissent concedes, dissenting op. at 164-65 n. 7, Fox says nothing at all about images. Nor does it suggest that the FCC’s previous fleeting-material policy applied only to “words,” or distinguished between words and images, as the Commission originally argued to us (an argument we forcefully rejected after reviewing three decades of rulings). Indeed, the Fox Court had no occasion to consider the application of the FCC’s pre-Golden Globes fleeting-material policy to images, since that case involved the use of spoken fleeting expletives.[5]
More to the point, read in context, this language does not refer to the FCC’s pre *132 Golden Globes fleeting-material policy at all. Instead, it describes the evolution of the Commission’s overall approach to a separate issue, i.e., whether “its enforcement power was limited to ‘deliberate, repetitive use of the seven words actually contained in the George Carlin monologue.’ ”[6] Id. at 1807 (quoting Pacifica Found., 2 F.C.C.R. at 2699 ¶ 12). Critically, the relevant portion of the Pacifica Foundation opinion that Fox quoted clearly distinguished between these two concepts, explaining that “speech that is indecent must involve more than an isolated,” i.e., fleeting, “use of an offensive word,” but that “repetitive use of specific words or phrases ” (i.e., the expletive words or phrases from the Carlin monologue) was not required. Pacifica Found., 2 F.C.C.R. at 2699 ¶ 13 (emphasis added). The Supreme Court in the quoted language from Fox, and the FCC in the Pacifica Foundation opinion that Fox quoted, were focused entirely on the FCC’s earlier policy (arising out of the Carlin monologue) regarding the “ ‘use of specific words or phrases’ ” as a prerequisite to a finding of indecency, not the question whether the reference to a particular word or image that might otherwise be deemed indecent was passing or fleeting in nature. Just as Fox involved spoken fleeting expletives, not fleeting images, Pacifica Foundation involved sustained, repeated use of expletives and sexually explicit language, not fleeting words or images.[7]
Moreover, the very next paragraph of Fox confirms that neither the Supreme Court nor the FCC interpreted Pacifica Foundation’s distinction between literal and non-literal uses of specific words or phrases to impact the otherwise applicable policy for fleeting material. Fox, 129 S.Ct. at 1807. In that paragraph, quoting an FCC policy statement from 2001, the Court made clear that, even after Pacifica Foundation, the exception for fleeting material still applied, separate and apart from any distinction arising between “literal” and “non-literal” words referring to sexual or excretory functions. Quoting a 2001 FCC policy statement, the Court said, “ ‘No single factor,’ the Commission said, ‘generally provides the basis for an indecency finding,’ but ‘where sexual or excretory references have been made once or have been passing or fleeting in nature, this characteristic has tended to weigh against a finding of indecency.’ ” Fox, 129 S.Ct. at 1807 (quoting In re Industry Guidance on the Commission’s Case Law Interpreting 18 U.S.C § lf6f and Enforcement Policies Regarding Broadcast Indecency, 16 F.C.C.R. 7999, 8003 ¶10, 8008 ¶ 17 (2001) (“Industry Guidance ”)) (emphasis added).[8]
If we were to read the Supreme Court’s background discussion in Fox as indicating that the history of FCC enforcement in the area of fleeting material recognized an ex *133 ception only for non-literal expletives, to the exclusion of images, we would be accusing the Supreme Court of rewriting history. This is because, in Young Broadcasting, which involved a fleeting image of a body part much like the one presented here, the Commission had the opportunity to explain that, after Pacifica Foundation, its fleeting-material policy did not apply to images. But the FCC did not say that, nor did it mention, much less rely on, Pacifica Foundation in analyzing the broadcast images at issue in that case.[9] See Young Broadcasting, 19 F.C.C.R. at 1755 ¶ 12 & n. 85.
Instead, the FCC noted the fact that “the actual exposure of the performer’s penis” in that case “was fleeting in that it occurred for less than a second.” Id. It then compared the overall circumstances in the case to other cases in which it had applied the fleeting-material exception, and held that Young Broadcasting was different — an exception to the exception— because “the material was apparently intended to pander to, titillate and shock viewers” and because the station knew in advance that “the interview involved performers who appear nude in order to manipulate and stretch their genitalia,” but “failed to take adequate precautions to ensure that no actionably indecent material was broadcast.” Id. at 1755-56 ¶¶ 12-13 & n. 35; see also CBS Corp., 535 F.3d at 186 & n. 16-17.
The Commission did not distinguish Young Broadcasting because it involved images rather than words, and its language demonstrates that it viewed the case as just another “instance” involving “fleeting remarks in live, unscripted broadcasts.” See Young Broadcasting, 19 F.C.C.R. at 1755 ¶ 12 (“We reject Young’s assertion that this material is equivalent to other instances in which the Commission has ruled that fleeting remarks in live, unscripted broadcasts do not meet the indecency definition.”). As we pointed out in our previous CBS opinion, had the FCC believed that its fleeting-material policy categorically did not apply to sexually explicit images, it most certainly would have said so rather than relying on distinctions that could apply to all fleeting material— remarks and images alike. Id. at 187. The FCC has not persuaded us that the fleeting-material exception was ever limited to words or expletives, and it cannot do so when in Young Broadcasting it treated a fleeting image just as it would have treated fleeting words.
Considering all of these facts, we do not see any basis to conclude that Fox alters our previous analysis of the fleeting-material exception. At bottom, the Commission attempts to convert a passing reference in Fox’s background section into a holding that undermines what the opinion otherwise makes clear: an agency may not apply a policy to penalize conduct that occurred before the policy was announced. The Commission’s argument also rewrites history, marginalizing the Supreme Court’s recognition in Fox that Golden Globes reflected a clear change in FCC’s fleeting-material policy, and ignoring the agency’s consistent practice — over three decades before its order in this case — of exempting all fleeting material, whether words or images, from enforcement under its indecency policy.[10]
*134 Thus, we conclude that Fox does not alter our reasoning or initial resolution of this case.

Part B: Opinion Regarding the Merits

In reasoning through Part A of this opinion, we referred extensively to our pri- or opinion, which the Supreme Court vacated before remanding the case to us in light of Fox. While we ordinarily would simply reinstate our prior opinion after determining that Fox did not undermine it, we cannot do that here, for two reasons. First, the previous opinion was a unanimous opinion authored by Judge Seirica, whereas the opinion we now will issue is non-unanimous, with Judge Scirica dissenting. Second, the new majority does not believe that the earlier opinion’s discussion of the scienter required for a violation was necessary, and we decline to readopt that portion of the analysis.
Accordingly, we do not reinstate our previous opinion. Instead, we incorporate below those portions of the opinion that we wish to readopt as part of our resolution of this case.[11]
In this petition for review, CBS appeals orders of the Federal Communications Commission imposing a monetary forfeiture under 47 U.S.C. § 503(b) for the broadcast of “indecent” material in violation of 18 U.S.C. § 1464 and 47 C.F.R. § 73.3999. The sanctions stem from CBS’s live broadcast of the Super Bowl XXXVIII Halftime Show, in which two performers deviated from the show’s script resulting in the exposure of a bare female breast on camera, a deceitful and manipulative act that lasted nine-sixteenths of one second. CBS transmitted the image over public airwaves, resulting in punitive action by the FCC.
CBS challenges the Commission’s orders on constitutional, statutory, and public policy grounds. Two of the challenges are paramount: (1) whether the Commission acted arbitrarily and capriciously under the Administrative Procedure Act, 5 U.S.C. § 706, in determining that CBS’s broadcast of a fleeting image of nudity was actionably indecent; and (2) whether the Commission, in applying three theories of liability — traditional respondeat superior doctrine, an alternative theory of vicarious liability based on CBS’s duties as a broadcast licensee, and the “willfulness” standard of the forfeiture statute — properly found CBS violated the indecency provisions of 18 U.S.C. § 1464 and 47 C.F.R. § 73.3999. We will vacate the FCC’s orders.
I.
On February 1, 2004, CBS presented a live broadcast of the National Football League’s Super Bowl XXXVIII, which included a halftime show produced by MTV *135 Networks.[12] Nearly 90 million viewers watched the Halftime Show, which began at 8:30 p.m. Eastern Standard Time and lasted about fifteen minutes. The Halftime Show featured a variety of musical performances by contemporary recording artists, with Janet Jackson as the announced headlining act and Justin Timber-lake as a “surprise guest” for the final minutes of the show.
Timberlake was unveiled on stage near the conclusion of the Halftime Show. He and Jackson performed his popular song “Rock Your Body” as the show’s finale. Their performance, which the FCC contends involved sexually suggestive choreography, portrayed Timberlake seeking to dance with Jackson, and Jackson alternating between accepting and rejecting his advances. The performance ended with Timberlake singing, “gonna have you naked by the end of this song,” and simultaneously tearing away part of Jackson’s bustier. CBS had implemented a five-second audio delay to guard against the possibility of indecent language being transmitted on air, but it did not employ similar precautionary technology for video images. As a result, Jackson’s bare right breast was exposed on camera for nine-sixteenths of one second.
Jackson’s exposed breast caused a sensation and resulted in a large number of viewer complaints to the Federal Communications Commission.[13] In response, the Commission’s Enforcement Bureau issued a letter of inquiry asking CBS to provide more information about the broadcast along with a video copy of the entire Super Bowl program. CBS supplied the requested materials, including a script of the Halftime Show, and issued a public statement of apology for the incident. CBS stated Jackson and Timberlake’s wardrobe stunt was unscripted and unauthorized, claiming it had no advance notice of any plan by the performers to deviate from the script.
On September 22, 2004, the Commission issued a Notice of Apparent Liability finding CBS had apparently violated federal law and FCC rules restricting the broadcast of indecent material. After its review, the Commission determined CBS was apparently liable for a forfeiture penalty of $550,000.[14] CBS submitted its Opposition to the Notice of Apparent Liability on November 5, 2004.
The Commission issued a forfeiture order over CBS’s opposition on March 15, 2006, imposing a forfeiture penalty of $550,000. In re Complaints Against Various Television Licensees Concerning Their February 1, 2001 Broadcast of the Super Bowl XXXVIII Halftime Show, 21 F.C.C.R. 2760 (2006) (“Forfeiture Order ”). Affirming its preliminary findings, the Commission concluded the Halftime Show broadcast was indecent because it depicted *136 a sexual organ and violated “contemporary community standards for the broadcast medium.” Id. at ¶ 10. In making this determination, the FCC relied on a contextual analysis to find the broadcast of Jackson’s exposed breast was: (1) graphic and explicit, (2) shocking and pandering, and (3) fleeting. Id. at ¶ 14. It further concluded that the brevity of the image was outweighed by the other two factors. Id. The standard applied by the Commission is derived from its 2001 policy statement setting forth a two-part test for indecency: (1) “the material must describe or depict sexual or excretory organs or activities,” and (2) it must be “patently offensive as measured by contemporary community standards for the broadcast medium.” In re Industry Guidance on the Commission’s Case Law Interpreting 18 U.S.C. § and Enforcement Policies Regarding Broadcast Indecency, 16 F.C.C.R. 7999, 8002 ¶¶ 7-8 (2001) (emphasis in original). The Commission had informed broadcasters in its 2001 policy statement that in performing the second step of the test — measuring the offensiveness of any particular broadcast — it would look to three factors: “(1) the explicitness or graphic nature of the description or depiction of sexual or excretory organs or activities; (2) whether the material dwells on or repeats at length descriptions of sexual or excretory organs or activities; (3) whether the material appears to pander or is used to titillate, or whether the material appears to have been presented for its shock value.” Id. at ¶ 10 (emphasis omitted).
Additionally, the FCC determined CBS’s actions in broadcasting the indecent image were “willful” and therefore sanctionable by a monetary forfeiture under 47 U.S.C. § 503(b)(1). See id. at ¶ 15. Adopting the definition of “willful” found in section 312(f)(1) of the Communications Act,[15] the Commission offered three explanations for its determination of willfulness. Id. First, the FCC found CBS “acted willfully because it consciously and deliberately broadcast the halftime show, whether or not it intended to broadcast nudity....” Id. Second, the FCC found CBS acted willfully because it “consciously and deliberately failed to take reasonable precautions to ensure that no actionably indecent material was broadcast.” Id. Finally, the FCC applied a respondeat superior theory in finding CBS vicariously liable for the willful actions of its agents, Jackson and Timberlake. Id.
On April 14, 2006, CBS submitted a Petition for Reconsideration under 47 C.F.R. § 1.106, raising several arguments against the Commission’s findings and conclusions. In its Order on Reconsideration, the FCC rejected CBS’s statutory and constitutional challenges and reaffirmed its imposition of a $550,000 forfeiture. In re Complaints Against Various Television Licensees Concerning Their February 1, 2004 Broadcast of the Super Bowl XXXVIII Halftime Show, 21 F.C.C.R. 6653 (2006) (“Reconsideration Order”). The Reconsideration Order revised the Commission’s approach for determining CBS’s liability under the willfulness standard. The Commission reiterated its application of vicarious liability in the form of respondeat superior and its determination that CBS was directly liable for failing to take adequate measures to prevent the broadcast of indecent material. See id. at ¶ 16. But it *137 abandoned its position that CBS acted willfully under 47 U.S.C. § 503(b)(1) by intentionally broadcasting the Halftime Show irrespective of its intent to broadcast the particular content included in the show. Instead, it determined CBS could be liable “given the nondelegable nature of broadcast licensees’ responsibility for their programming.” Id. at ¶ 23. The Commission has since elaborated on this aspect of the Reconsideration Order, explaining it as a separate theory of liability whereby CBS can be held vicariously liable even for the acts of its independent contractors because it holds non-delegable duties as a broadcast licensee to operate in the public interest and to avoid broadcasting indecent material. See, e.g., FCC Br. at 44-45.
CBS timely filed a petition for review of the Reconsideration Order on July 28, 2006. It challenges the FCC’s orders on several grounds, and both parties are supported by briefing from several amici.
II.
Our standard of review of agency decisions is governed by the Administrative Procedure Act, 5 U.S.C. § 706. Under the Administrative Procedure Act, we “hold unlawful and set aside agency action, findings, and conclusions” that are found to be “arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.” Id. § 706(2)(A); see, e.g., Motor Vehicle Mfrs. Ass’n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 41, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).
The scope of review under the “arbitrary and capricious” standard is “narrow, and a court is not to substitute its judgment for that of the agency.” State Farm, 463 U.S. at 43, 103 S.Ct. 2856. Nevertheless, the agency must reach its decision by “examining] the relevant data,” and it must “articulate a satisfactory explanation for its action including a ‘rational connection between the facts found and the choice made.’ ” Id. (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)). We generally find agency action arbitrary and capricious where:
the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency’s action that the agency itself has not given.
Id. at 43, 103 S.Ct. 2856 (citing SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947)).
Our review of the constitutional questions is more searching. In cases raising First Amendment issues, we have “an obligation ‘to make an independent examination of the whole record’ in order to make sure that ‘the judgment does not constitute a forbidden intrusion on the field of free expression.’ ” United States v. Various Articles of Merch., Schedule No. 287, 230 F.3d 649, 652 (3d Cir.2000) (quoting Bose Corp. v. Consumers Union, 466 U.S. 485, 499, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (citations omitted)).
III.
The FCC possesses authority to regulate indecent broadcast content, but it had long practiced restraint in exercising this authority. During a span of nearly three decades, the Commission frequently declined to find broadcast programming indecent, its restraint punctuated only by a *138 few occasions where programming contained indecent material so pervasive as to amount to “shock treatment” for the audience. Throughout this period, the Commission consistently explained that isolated or fleeting material did not fall within the scope of actionable indecency.
At the time the Halftime Show was broadcasted by CBS, the FCC’s policy on fleeting material was still in effect. The FCC contends its restrained policy applied only to fleeting utterances — specifically, fleeting expletives — and did not extend to fleeting images. But a review of the Commission’s enforcement history reveals that its policy on fleeting material was never so limited. The FCC’s present distinction between words and images for purposes of determining indecency represents a departure from its prior policy.
Like any agency, the FCC may change its policies without judicial second-guessing. But it cannot change a well-established course of action without supplying notice of and a reasoned explanation for its policy departure. Because the FCC failed to satisfy this requirement, we find its new policy arbitrary and capricious under the Administrative Procedure Act as applied to CBS.
A.
Section 326 of the Communications Act prohibits the FCC from censoring its licensees’ broadcasts.[16] Subject to this constraint, the FCC retains authority to regulate obscene, indecent, or profane broadcast content. See 18 U.S.C. § 1464 (“Whoever utters any obscene, indecent, or profane language by means of radio communication shall be fined under this title or imprisoned not more than two years, or both.”). Indecency and obscenity are distinct categories of speech. See FCC v. Pacifica Found., 438 U.S. 726, 739-41, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978) (plurality opinion) (“Pacifica”). Indecency, unlike obscenity, is protected by the First Amendment. Sable Commc’ns of Cal., Inc. v. FCC, 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989). The FCC’s authority to restrict indecent broadcast content is nevertheless constitutionally permissible because of the unique nature of the broadcast medium. Pacifica, 438 U.S. at 750-51, 98 S.Ct. 3026; see also id. at 755-56, 98 S.Ct. 3026 (Powell, J., concurring).
Congress authorized the FCC to impose forfeiture penalties for violations of 18 U.S.C. § 1464 in I960.[17] But the FCC did not exercise its authority to find a broadcast statutorily “indecent” until 1975, when it issued a forfeiture penalty against Pacifica Foundation for broadcasting comedian George Carlin’s “Filthy Words” monologue. See In re Citizen’s Complaint Against Pacifica Found., Station WBAI(FM), N.Y., N.Y., 56 F.C.C.2d 94, 1975 WL 29897 (1975). Carlin’s monologue, which Pacifica aired on the radio in an early-afternoon time slot, contained extensive and repetitive use of several vulgar expletives over a period of twelve minutes. See Pacifica, 438 U.S. at 739, 98 S.Ct. 3026.
*139 Pacifica appealed the FCC’s forfeiture order to the United States Court of Appeals for the D.C. Circuit. The FCC issued a clarification order while Pacifica’s appeal was pending, expressly limiting its prior forfeiture order to the specific facts of the Carlin monologue. In re ‘A Petition for Clarification or Reconsideration’ of a Citizen’s Complaint Against Pacifica Found., Station WBAI(FM), N.Y., N.Y., 59 F.C.C.2d 892, 1976 WL 31850 (1976) (“Pacifica Clarification Order ”). Expressly acknowledging the forfeiture order’s potential negative impact on broadcast coverage of live events where “there is no opportunity for journalistic editing,” the FCC stated its intention to exclude such circumstances from the scope of actionable indecency. Id. at ¶ 4 n. 1.
Following the Pacifica Clarification Order, the D.C. Circuit reversed the FCC’s forfeiture order against Pacifica as vague and overbroad and found the agency’s indecency regime constituted invalid censorship under 47 U.S.C. § 326. Pacifica Found, v. FCC, 556 F.2d 9, 14 (D.C.Cir.1977). The FCC appealed and the Supreme Court reversed in a narrow plurality opinion. See Pacifica, 438 U.S. at 726, 98 S.Ct. 3026. The Court rejected Pacifica’s statutory argument that the term “indecent” in 18 U.S.C. § 1464 only covered obscene speech. Pacifica, 438 U.S. at 739, 98 S.Ct. 3026. But the Court confirmed the general validity of the FCC’s indecency regime, “emphasizing] the narrowness of [its] holding,” which it confined to the facts of the Carlin monologue. Id. at 750, 98 S.Ct. 3026. Justices Powell and Blaekmun concurred in the judgment, writing separately in part to reiterate the narrowness of the decision and to note the Court’s holding did not “speak to cases involving the isolated use of a potentially offensive word in the course of a radio broadcast, as distinguished from the verbal shock treatment administered by respondent here.” Id. at 760-61, 98 S.Ct. 3026 (Powell, J., concurring).
Shortly after the Court’s ruling in Pacifica, a broadcaster’s license renewal was challenged on the basis that the broadcaster had aired indecent programming. See In re Application of WGBH Educ. Found., 69 F.C.C.2d 1250, 1978 WL 36042 (1978) (“WGBH ”). Viewer complaints alleged the broadcaster aired several programs containing nudity and other allegedly offensive material. Id. at ¶ 2. Distinguishing the facts of WGBH from the Court’s ruling in Pacifica, the FCC rejected the challenge and denied that Pacifica afforded it any “general prerogative to intervene in any case where words similar or identical to those in Pacifica are broadcast over a licensed radio or television station.” Id. at ¶ 10. The FCC, noting it “intend[ed] strictly to observe the narrowness of the Pacifica holding” and emphasizing the language in Justice Powell’s concurring opinion, id. at ¶ 10, concluded the single use of an expletive in a program “should not call for us to act under the holding of Pacifica.” Id. at ¶ 10 n. 6.
The FCC’s restrained enforcement policy continued in the years following Pacifica. Rejecting another challenge to a broadcaster’s license renewal based on the airing of allegedly indecent material, the FCC reaffirmed that isolated use of expletives in broadcasts did not constitute actionable indecency under 18 U.S.C. § 1464. See In re Application of Pacifica Found., 95 F.C.C.2d 750, 1983 WL 182971 (1983). The complaint alleged the broadcaster had on multiple occasions aired programming containing language such as “motherfucker,” “fuck,” and “shit.” Id. at ¶ 16. The FCC held these facts did not constitute a prima facie showing of actionable indecency under 18 U.S.C. § 1464, because the complainant had failed to show the broadcasts amounted to “verbal shock treat *140 ment” as opposed to “isolated use.” Id. at ¶ 18.
In April 1987, the FCC issued three simultaneous indecency decisions. See In re Pacifica Found., Inc., 2 F.C.C.R. 2698 (1987); In re Regents of the Univ. of Cal., 2 F.C.C.R. 2703 (1987); In re Infinity Broad. Corp., 2 F.C.C.R. 2705 (1987). These decisions reaffirmed the Commission’s restrained enforcement policy and reiterated the agency’s policy that isolated or fleeting material would not be considered actionably indecent. See, e.g., Regents of the Univ. of Cal. at ¶ 3 (“Speech that is indecent must involve more than an isolated use of an offensive word.”).
Later in 1987, reconsidering these decisions, the Commission abandoned the view that only the particular “dirty words” used in the Carlin monologue could be indecent.[18] Instead, the FCC explained it would thereafter rely on the broader terms of its generic indecency standard, which defined indecent material as “language that describes, in terms patently offensive as measured by contemporary community standards for the broadcast medium, sexual or excretory activities or organs, when there is a reasonable risk that children may be in the audience.” Id. at ¶¶ 2, 5.[19] Even so, the FCC affirmed all three decisions on reconsideration, never indicating disagreement with those decisions’ express statements that isolated or fleeting material could not be actionably indecent. Id.
In 2001, the broadcast industry sought clarification of the policies and rules of the FCC’s indecency enforcement regime. Guidance for the industry came in the form of a policy statement issued by the Commission. See Industry Guidance on the Commission’s Case Law Interpreting 18 U.S.C. § UpBlp and Enforcement Policies Regarding Broadcast Indecency, 16 F.C.C.R. 7999, ¶ 19 (2001) (“Industry Guidance ”). The policy statement included multiple examples of FCC rulings as “case comparisons” highlighting the factors that had proved significant in prior indecency determinations. One of the factors noted as leading to prior determinations that a program was not actionably indecent was the “fleeting or isolated” nature of potentially indecent material in the context of the overall broadcast. See id. at ¶¶ 17-18.
Soon after the Commission’s issuance of the Industry Guidance policy statement, its restrained enforcement policy changed. In an unscripted remark during a live NBC broadcast of the Golden Globe Awards on January 19, 2003, musician Bono said “this is really, really fucking brilliant” while accepting an award. See In re Complaints Against Various Broadcast Licensees Regarding Their Airing of the “Golden Globe Awards” Program, 19 *141 F.C.C.R. 4975, 13 n. 4 (2004) (“Golden Globes ”). Viewers complained to the FCC about Bono’s speech, but the Commission’s Enforcement Bureau rejected the complaints in part because the utterance was fleeting and isolated and therefore did “not fall within the scope of the Commission’s indecency prohibition.” See In re Complaints Against Various Broadcast Licensees Regarding Their Airing of the “Golden Globe Awards” Program, 18 F.C.C.R. 19859, ¶ 6 (FCC Enforcement Bureau 2003). The Enforcement Bureau specifically reaffirmed that “fleeting and isolated remarks of this nature do not warrant Commission action.” Id.
On March 3, 2004, the full Commission reversed the Enforcement Bureau’s decision. See generally Golden Globes, supra. Although the FCC acknowledged the existence of its restrained enforcement policy for isolated or fleeting utterances, it overruled all of its prior cases holding such instances not actionable. Id. at ¶ 12 (“While prior Commission and staff action have indicated that isolated or fleeting broadcasts of the ‘F-Word’ such as that here are not indecent or would not be acted upon, consistent with our decision today we conclude that any such interpretation is no longer good law.”). But the Commission made it clear that licensees could not be held liable for broadcasting fleeting or isolated indecent material prior to its Golden Globes decision. See id. at ¶ 15 & n. 40 (declining to impose a forfeiture penalty because “existing precedent would have permitted [the Golden Globe Awards] broadcast” and therefore it would be “inappropriate” to sanction licensees for conduct prior to notice of policy change).[20]
The FCC’s new indecency policy created in Golden Globes was soon challenged by the broadcast industry. On February 21, 2006, the Commission issued an omnibus order resolving multiple indecency complaints against television broadcasters in an effort to “provide substantial guidance to broadcasters and the public about the types of programming that are impermissible under our indecency standard.” In re Complaints Regarding Various Television Broadcasts Between February 2, 2002 and March 8, 2005, 21 F.C.C.R. 2664, ¶ 2 (2006) (“Omnibus Order”). The Omnibus Order found four programs indecent and profane: (1) Fox’s broadcast of the 2002 Billboard Music Awards, in which performer Cher used an unscripted expletive during her acceptance speech; (2) Fox’s broadcast of the 2003 Billboard Music Awards, in which presenter Nicole Richie used two unscripted expletives; (3) ABC’s broadcast of various episodes of its NYPD Blue series, in which assorted characters used scripted expletives; and (4) a CBS broadcast of The Early Show, in which a guest used an unscripted expletive during a live interview. Id. at ¶¶ 101, 112 n. 64, 125, 137. Applying its policy announced in Golden Globes, the Commission found the broadcasts indecent despite the fleeting and isolated nature of the offending expletives. Id. at ¶¶ 104,116,129,140.
As in Golden Globes, the Commission recognized the inequity in retroactively sanctioning the conduct of broadcast licensees. Because the offending broadcasts occurred prior to the issuance of its Golden Globes decision, the FCC concluded that existing precedent would have permitted the broadcasts. Id. Accordingly, the FCC did not issue forfeiture orders *142 against any of the licensees. Id. at ¶¶ 111, 124,186,145.
The networks appealed the Omnibus Order, and the cases were consolidated before the United States Court of Appeals for the Second Circuit. Granting a request by the FCC, the court remanded the matter to allow the Commission an opportunity to address the petitioners’ arguments. After soliciting public comment, the FCC issued a new order on November 6, 2006, reaffirming its indecency findings against Fox for the 2002 and 2003 Billboard Music Awards but reversing its finding against CBS for The Early Show broadcast and dismissing the complaint against ABC on procedural grounds. See In re Complaints Regarding Various Television Broadcasts Between February 2, 2002 and March 8, 2005, 21 F.C.C.R. 13299 (2006) (“Fox Remand Order ”).
The networks’ original appeal to the Second Circuit was reinstated on November 8, 2006, and consolidated with a petition for review of the Fox Remand Order. Fox Television Stations, Inc. v. FCC, 489 F.3d 444, 454 (2d Cir.2007) (“Fox ”), cert. granted, 552 U.S. 1255, 128 S.Ct. 1647, 170 L.Ed.2d 352 (2008). The court granted motions to intervene by other networks, including CBS, and the networks collectively raised several challenges to the validity of the Fox Remand Order essentially mirroring those raised in this case. See Fox, 489 F.3d at 454.
Undertaking a thorough review of the history of the FCC’s indecency regime similar to that which we engage in here, the Second Circuit found the FCC’s “consistent enforcement policy” prior to the Golden Globes decision excluded fleeting or isolated expletives from regulation. Id. at 455. The court concluded “there is no question” that the FCC changed its policy with respect to fleeting expletives, and that the policy “changed with the issuance of Golden Globes.” Id. (citations omitted). Judge Leval, dissenting in Fox for other reasons, agreed with the majority’s conclusion that the FCC changed its position on fleeting utterances, although he considered the change of standard “relatively modest.” See id. at 469 (Leval, J., dissenting); see also id. at 470 (Leval, J., dissenting) (stating that the FCC changed its position and finding that the FCC clearly acknowledges that its Golden Globes and Fox Remand Order rulings were not consistent with its prior standard). We agree that the Golden Globes decision represented a policy departure by the FCC. The extensive history detailed above demonstrates a consistent and entrenched policy of excluding fleeting broadcast material from the scope of actionable indecency.
In spite of this history, the FCC contends that by February 1, 2004 (the date of the Halftime Show), a broadcaster in CBS’s position should have known that even isolated or fleeting indecent material in programming could be actionable. Despite its announced reversal of prior policy in its Golden Globes decision on March 3, 2004, the Commission points to one sentence in its 2001 policy statement to support its position: “[Ejven relatively fleeting references may be found indecent where other factors contribute to a finding of patent offensiveness.” Industry Guidance at ¶ 19.[21] But when read in its origi *143 nal context rather than as an isolated statement, this sentence does not support the Commission’s assertion here. The “relatively fleeting references” identified by that sentence are distinguishable from the truly “fleeting” broadcast material the FCC had included in its fleeting material policy. The paragraph cites, for instance, a notice of apparent liability against WEZB-FM, New Orleans, to exemplify the kind of “relatively fleeting references” the FCC considered actionably indecent. See id. (citing EZ New Orleans, Inc. (WEZB(FM)), 12 F.C.C.R. 4147 (MMB 1997) (“WEZB-FM NAL ”)). The citation to WEZB-FM NAL specifically describes as indecent an “announcer joke” involving incest, forceful sexual contact with children, and a reference to cleaning “blood off [a] diaper.” Id. The “announcer joke” is distinguishable on its face from “fleeting” material such as a brief glimpse of nudity or isolated use of an expletive. Moreover, the “announcer joke” was merely one incident among dozens included in a transcript supporting the forfeiture liability determination in the WEZB-FM NAL,[22]
Nevertheless, as it clarified at oral argument, the FCC relies on its 2001 Industry Guidance to contend its policy on fleeting or isolated material “was a policy with respect to cases relying solely on the use of expletives.” As the Commission explained at oral argument, “[tjhere was not a policy that all short utterances were exempt.” This reading of the Commission’s policy on fleeting material is untenable. Even the FCC’s Industry Guidance fails to support such a narrow characterization. See, e.g., Industry Guidance at ¶ 18 (quoting L.M. Commc’ns of S. C., Inc. (WYBB(FM)), 7 F.C.C.R. 1595 (MMB 1992), for the proposition that “ ‘a fleeting or isolated utterance ..., within the context of live and spontaneous programming, does not warrant a Commission sanction.’ ”).
Accordingly, we find the Commission’s unsubstantiated contentions in this regard contradict the lengthy history of the Commission’s restrained enforcement policy. While “an agency’s interpretation of its own precedent is entitled to deference,” Cassell v. FCC, 154 F.3d 478, 488 (D.C.Cir.1998), deference is inappropriate where the agency’s proffered interpretation is capricious. Until its Golden Globes decision in March of 2004, the FCC’s policy was to exempt fleeting or isolated material from the scope of actionable indecency. Because CBS broadcasted the Halftime *144 Show prior to Golden Globes, this was the policy in effect when the incident with Jackson and Timberlake occurred.
B.
If the FCC’s restrained enforcement policy for fleeting broadcast material was intact until the Golden Globes decision in March of 2004, our inquiry would end with a simple examination of the chronology of the FCC’s actions. CBS broadcasted the Halftime Show more than a month prior to Golden Globes. The Commission’s orders here would amount to a retroactive application of the new policy it announced in Golden Globes, which would raise due process concerns. The Commission has recognized the inequity in such an outcome. See Omnibus Order, supra, at ¶¶ 111, 124, 136, 145 (declining to issue forfeiture orders because the offending broadcasts occurred prior to the issuance of its Golden Globes decision, and therefore “existing precedent would have permitted [the] broadcasts”); see also Trinity Broad. of Fla., Inc., 211 F.3d at 628 (“Because ‘[d]ue process requires that parties receive fair notice before being deprived of property,’ we have repeatedly held that ‘[i]n the absence of notice — for example, where the regulation is not sufficiently clear to warn a party about what is expected of it — an agency may not deprive a party of property by imposing civil or criminal liability.’ ” (citation omitted)).
But the FCC urges another reading of Golden Globes, perhaps less obvious yet still plausible, which interprets Golden Globes as addressing only the broadcast of fleeting expletives, not other fleeting material such as brief images of nudity. Further, the Commission contends its fleeting material policy, as initially adopted, was limited to fleeting words and did not extend to fleeting images. Under this view, Golden Globes would be inapposite here — the Commission’s sanction against CBS would be in line with its treatment of images as part of its historical indecency enforcement regime. If, as the FCC contends, Golden Globes was limited to fleeting expletives, then its orders issuing forfeiture penalties in this case did not constitute a retroactive application of the policy change in Golden Globes.
But even if we accept the FCC’s interpretation of Golden Globes and read it as only addressing fleeting expletives, the Commission’s view of the scope of its fleeting materials policy prior to Golden Globes is unsustainable. As we will explain, the Commission — before Golden Globes — had not distinguished between categories of broadcast material such as images and words. Accordingly, even if, as the FCC contends, Golden Globes only addressed expletives, it nevertheless represented the first time the Commission distinguished between formats of broadcast material or singled out any one category of material for special treatment under its fleeting material policy. That is, it altered the scope of the FCC’s fleeting material policy by excising only one category of fleeting material — fleeting expletives — from the policy. And it therefore did not constitute an abdication of its fleeting material policy. Rather, a residual policy on other categories of fleeting material — including all broadcast content other than expletives— remained in effect.
Accordingly, subsequent agency action was required to change the fleeting material policy as it applied to broadcast content other than expletives. By targeting another category of fleeting material— fleeting images — in its orders against CBS in this case, the FCC apparently sought to further narrow or eliminate the fleeting material policy as it existed following Golden Globes. The Commission’s determination that CBS’s broadcast of a nine-six *145 teenths of one second glimpse of a bare female breast was actionably indecent evidenced the agency’s departure from its prior policy. Its orders constituted the announcement of a policy change — that fleeting images would no longer be excluded from the scope of actionable indecency.
The question is whether the FCC’s departure from its prior policy is valid and enforceable as applied to CBS. As noted, agencies are free to change their rules and policies without judicial second-guessing. See, e.g., Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 863, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). But an agency cannot ignore a substantial diversion from its prior policies. See Ramaprakash v. FAA, 346 F.3d 1121, 1124 (D.C.Cir.2003) (agency must “provide a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored”). As the Supreme Court explained in State Farm,, an agency must be afforded great latitude to change its policies, but it must justify its actions by articulating a reasoned analysis behind the change:
Petitioner ... contend[s] that the rescission of an agency rule should be judged by the same standard a court would use to judge an agency’s refusal to promulgate a rule in the first place — a standard Petitioner believes considerably narrower than the traditional arbitrary and capricious test and “close to the borderline of nonreviewability.” We reject this view.... Petitioner’s view would render meaningless Congress’ authorization for judicial review of orders revoking ... rules. Moreover, the revocation of an extant regulation is substantially different than a failure to act. Revocation constitutes a reversal of the agency’s former views as to the proper course. A “settled course of behavior embodies the agency’s informed judgment that, by pursuing that course, it will carry out the policies committed to it by Congress. There is, then, at least a presumption that those policies will be carried out best if the settled rule is adhered to.” Accordingly, “an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance.”
463 U.S. at 42-43, 103 S.Ct. 2856 (citations omitted).
 The agency’s obligation to supply a reasoned analysis for a policy departure requires an affirmative showing on record. It “must examine the relevant data and articulate a satisfactory explanation for its action including a ‘rational connection between the facts found and the choice made.’ ” Id. at 43, 103 S.Ct. 2856 (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)). A reviewing court “must ‘consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.’” Id. (citations omitted). The agency’s actions will then be set aside as “arbitrary and capricious” if the agency failed to provide a “reasoned explanation” for its decision to change course. Massachusetts v. EPA, 549 U.S. 497, 127 S.Ct. 1438, 1463, 167 L.Ed.2d 248 (2007); see State Farm, 463 U.S. at 42-43, 103 S.Ct. 2856; Nat’l Cable & Telecomms. Ass’n v. Brand X Internet Servs., 545 U.S. 967, 981, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005) (“unexplained inconsistency” in agency practice is a reason for holding a policy reversal “arbitrary and capricious” under the APA, unless “the agency adequately explains the reasons for a reversal of policy”).
In Fox, the Second Circuit analyzed the FCC’s changed policy on fleeting expíe *146 tives under State Farm,[23] but the panel split on the outcome of its analysis. Judge Pooler, writing for the majority, found the policy change arbitrary and capricious because the FCC failed to provide a reasoned explanation for the change. Fox, 489 F.3d at 455 (“The Networks contend that the Remand Order is arbitrary and capricious because the FCC has made a 180-degree turn regarding its treatment of ‘fleeting expletives’ without providing a reasoned explanation justifying the about-face. We agree.”). Scrutinizing the sufficiency of the Commission’s explanation for its policy change, the court rejected the agency’s proffered rationale as “disconnected from the actual policy implemented by the Commission.” Id. at 459 n. 8 (citation omitted).
Judge Leval, writing in dissent, also applied State Farm, but he disagreed with the amount of deference the majority afforded the FCC’s policy decision. Although he agreed that the FCC was obligated to provide a reasoned explanation for its policy shift, he found the agency’s explanation sufficient. As Judge Leval explained:
In my view, in changing its position on the repetition of an expletive, the Commission complied with these requirements. It made clear acknowledgment that its Golden Globes and Remand Order rulings were not consistent with its prior standard regarding lack of repetition. It announced the adoption of a new standard. And it furnished a reasoned explanation for the change. Although one can reasonably disagree with the Commission’s new position, its explanation ... is not irrational, arbitrary, or capricious. The Commission thus satisfied the standards of the Administrative Procedure[ ] Act.
Id. at 470 (Leval, J., dissenting).
In this case, State Farm also provides the correct standard of review, but we need not engage in the substantive inquiry that divided the Second Circuit panel in Fox. There, as Judge Leval noted in dissent, the FCC provided an explanation for changing its policy on fleeting expletives. The critical question splitting the court was whether that explanation was adequate under State Farm. Here, unlike in Fox, the FCC has not offered any explanation — reasoned or otherwise — for changing its policy on fleeting images. Rather, the FCC asserts it never had a policy of excluding fleeting images from the scope of actionable indecency, and therefore no policy change occurred when it determined that the Halftime Show’s fleeting image of Janet Jackson’s breast was actionably indecent. Accordingly, we must determine whether the FCC’s characterization of its policy history is accurate. If it is not, then the FCC’s policy change must be set aside *147 as arbitrary and capricious, because it has failed to even acknowledge its departure from its former policy let alone supply a “reasoned explanation” for the change as required by State Farm.
CBS contends the FCC’s indecency regime treated words and images alike, so the exception for fleeting material applied with equal force to words and images. The Commission rejects this assertion, contending its prior policy on fleeting material was limited to words alone. Although the FCC acknowledges it had never explicitly distinguished between images and words for the purpose of defining the scope of actionable indecency, it contends the existence of such a distinction was obvious, even if unstated.[24]
The Commission’s conclusion on the nature and scope of its indecency regime— including its fleeting material policy — is at odds with the history of its actions in regulating indecent broadcasts. In the nearly three decades between the Supreme Court’s ruling in Pacifica and CBS’s broadcast of the Halftime Show, the FCC had never varied its approach to indecency regulation based on the format of broadcasted content. Instead, the FCC consistently applied identical standards and engaged in identical analyses when reviewing complaints of potential indecency whether the complaints were based on words or images.
In 2000, for example, the FCC rejected a complaint of indecency based on scenes of nudity in a television broadcast of the film “Schindler’s List.” In re WPBN/ WTOM License Subsidiary, Inc., 15 F.C.C.R. 1838 (2000). Finding the broadcasted images not actionably indecent, the FCC noted “nudity itself is not per se indecent” and applied the identical indecency test the agency used to review potentially indecent language. Id. at ¶ 11. The Commission did not treat the nudity complaint differently — factually or legally — from a complaint for indecency based on a spoken utterance. See id. at ¶ 10 n. 5 (“The Supreme Court has observed that contextual assessments may involve (and are not limited to) an examination of whether the actual words or depictions in context are, for example, vulgar or shocking, a review of the manner in which the words or depictions are portrayed, and an analysis of whether the allegedly indecent material is isolated or fleeting.” (emphasis added)). The Commission even referred in a footnote to its policy towards fleeting material, never suggesting the policy would be inapplicable because the offending broadcast content was an image rather than a word. See id. at ¶ 5 n. 10 (explaining that contextual assessments of whether certain programming is patently offensive, and therefore actionably indecent, “may involve ... analysis of whether the alleg *148 edly indecent material is isolated or fleeting”).
The Commission took the same approach when reviewing viewer complaints against a television station for multiple broadcasts of programs containing expletives, nudity, and other allegedly indecent material. See WGBH, supra[25] Categorically denying that the programming in WGBH was actionably indecent,[26] the FCC distinguished the facts of WGBH from the Carlin monologue in Pacifica by invoking its restrained enforcement policy for fleeting or isolated material. See id. at ¶ 10 (“We intend strictly to observe the narrowness of the Pacifica holding.... Justice Powell’s concurring opinion ... specifically distinguished ‘the verbal shock treatment [in Pacifica]’ from ‘the isolated use of a potentially offensive word in the course of a radio broadcast.’ ... In the case before us, petitioner has made no comparable showing of abuse by WGBH-TV of its programming discretion.”); id. at ¶ 10 n. 6 (finding that WGBH-TV’s programs “differfed] dramatically from the concentrated and repeated assault involved in Pacifica ”). In its indecency analysis in WGBH, the FCC made no distinction between words and images (nudity or otherwise).
As evidence that the FCC’s policy on fleeting material, as it existed at the time of the Halftime Show, did not distinguish between words and images, CBS presented several complaints viewers had submitted to the FCC about allegedly indecent broadcasts. CBS Letter Br., submitted pursuant to Fed. R.App. P. 28(j) (Aug. 13, 2007). Accompanying each complaint is a corresponding reply letter by the FCC rejecting the indecency allegation. Each complaint involves some variety of sexually explicit imagery. One letter, for example, describes the early-evening broadcast of a female adult dancer at a strip club and alleges the broadcast contained visible scenes of the woman nude from the waist down revealing exposed buttocks and “complete genital nudity” for approximately five to seven seconds. Another letter describes in part a Sunday-morning television broadcast of the movie “Devices and Desires,” which included “scenes of a topless woman in bed with her lover, with her breast very clearly exposed, several scenes of a topless woman running on the beach, and several scenes of a nude female corpse, with the breasts clearly exposed.”
Citing Pacifica and the indecency standard used to review the broadcast of potentially indecent language, the FCC summarily rejected each of these complaints as “not actionably indecent.” The FCC contends these “form letters” are irrelevant, *149 as the letters “do not even explain the grounds for the staffs conclusions that the broadcasts were not indecent, much less rely on the ‘fleeting’ nature of any alleged nudity as a reason for rejecting the complaints.” FCC Letter Br., siibmitted pursuant to Fed. R.App. P. 28(j) (Aug. 27, 2007). But the relevance of the FCC’s rejection letters is not found in their specific reasons for finding the images not actionably indecent. Rather, the rejection letters illustrate that the FCC used the identical form letters and indecency analyses to address complaints of indecent nudity that it had long used to address complaints of indecent language.
Confronted with this history of FCC enforcement of restrictions on broadcast indecency, the entirety of which reveals no distinction in treatment of potentially indecent images versus words, the FCC nevertheless finds such a distinction evident in its prior decisions. See, e.g., FCC Br. at 26-27. To support this view, the FCC offers its Notice of Apparent Liability for Forfeiture in In re Young Broadcasting of San Francisco, Inc., 19 F.C.C.R. 1751 (2004), issued four days before CBS’s broadcast of the Halftime Show. See Reconsideration Order at ¶¶ 10, 36; FCC Br. at 26-27. Young Broadcasting involved a morning news show segment in which two performers from a production titled “Puppetry of the Penis” appeared in capes but were otherwise naked underneath the capes. Young Broadcasting at ¶ 13. The two men, whose act involved manipulating and stretching their genitalia to simulate various objects, performed a demonstration of their act with the agreement of the show’s hosts and at the urging of off-camera station personnel. Id. Although the performance was directed away from the camera, the penis of one performer was fully exposed on camera for less than one second as the men turned away to act out their performance. See id. at ¶¶ 12, 13. Based on these facts, the Commission found the station apparently liable for a forfeiture penalty for broadcasting indecent material. Id. at ¶ 16.
The FCC contends Young Broadcasting was not a departure from its prior indecency regime. Rather, as it explains, Young Broadcasting merely represented the first instance in which the Commission expressly articulated its pre-existing (but unstated) policy of treating fleeting images differently from fleeting words.[27] On this view, according to the FCC, Young Broadcasting should have dispelled any doubts about the historical breadth of its fleeting material policy prior to the Halftime Show because it was issued a few days before CBS’s broadcast. But Young Broadcasting is unavailing for this purpose. It makes no distinction, express or implied, between words and images in reaching its indecency determination. To the contrary, it discusses and compares several other FCC determinations on potentially indecent utterances and depictions, treating the cases interchangeably and ultimately distinguishing those cases’ outcomes without any indication that the format of the *150 offending material was a relevant consideration. See, e.g., id. at ¶ 12 & n. 35; id. at ¶ 14.[28]
Accordingly, Young Broadcasting does not support the FCC’s assertion here that its policy on fleeting material had always excluded images and applied only to words. Young Broadcasting appears instead to be best understood as the Commission’s initial effort to abandon its restrained enforcement policy on fleeting material. While the final disposition of Young Broadcasting was still unresolved,[29] the overarching policy departure that the Commission sought to accomplish there was effectuated by a combination of its Golden Globes order and its orders on appeal here. The Commission’s reasoning in Young Broadcasting is therefore illuminating here.
In Young Broadcasting, the Commission distinguished that case’s facts from several of its prior orders. But in so doing, the Commission overlooked the fact that application of its fleeting material policy had been a determinative factor in those prior orders. For example, the licensee in Young Broadcasting cited for support L.M. Communications, 7 F.C.C.R. 1595 (1992), in which the radio broadcast of a single expletive was found not actionably indecent. Young Broadcasting at ¶ 12 n. 35. The FCC found L.M. Communications “distinguishable because there was no finding that the material, in context, was pandering, titillating or intended to shock the audience.” Id. But L.M. Communications made no reference to the pandering, titillating or shocking nature of the subject broadcast material. Rather, it determined the material was not actionably indecent because the “broadcast contained only a fleeting and isolated utterance which, within the context of live and spontaneous pro *151 gramming, does not warrant a Commission sanction.” L.M. Commc’ns, 7 F.C.C.R. at 1595.
The Commission’s failure to acknowledge the existence of its prior policy on fleeting material in Young Broadcasting is illustrative of its approach here. In Young Broadcasting, it read the policy out of existence by substituting new rationales for its prior indecency determinations that had applied the policy. Here, the Commission is foreclosed from adopting the same approach by its admission in Golden Globes that the fleeting material policy existed. So it instead apparently seeks to revise the scope of the policy by contending the policy never included fleeting images. But extensive precedent over thirty years of indecency enforcement demonstrates otherwise.
Our reluctant conclusion that the FCC has advanced strained arguments to avoid the implications of its own fleeting indecency policy was echoed by our sister circuit in Fox:
In [its Omnibus Order], the FCC “rejects] Fox’s suggestion that Nicole Richie’s [use of two expletives] would not have been actionably indecent prior to our Golden Globes decision,” and would only concede that it was “not apparent” that Cher’s [use of one expletive] at the 2002 Billboard Music Awards would have been actionably indecent at the time it was broadcast. [Id.] at ¶¶ 22, 60. Decisions expressly overruled in Golden Globes were now dismissed as “staff letters and dicta,” and the Commission even implied that the issue of fleeting expletives was one of first impression for the FCC in Golden Globes. Id. at ¶ 21 (“[I]n 2004, the Commission itself considered for the first time in an enforcement action whether a single use of an expletive could be considered indecent.”).
Fox, 489 F.3d at 456 n. 6. When confronted with these troublesome revisionist arguments, the FCC conceded the existence of its prior policy. See id. at 456 (“[I]n its brief to this court, the FCC now concedes that Golden Globes changed the landscape with regard to fleeting expletives.” (citations omitted)); see also id. at 470 (Leval, J., dissenting) (“[The FCC] made clear acknowledgment that its Golden Globes and Remand Order rulings were not consistent with its prior standard regarding lack of repetition.”). But it has made no such concession here. Faced with extensive evidence to the contrary, the Commission nevertheless continues to assert that its fleeting material policy was limited to words and did not exclude fleeting images from the scope of actionable indecency.
In sum, the balance of the evidence weighs heavily against the FCC’s contention that its restrained enforcement policy for fleeting material extended only to fleeting words and not to fleeting images. As detailed, the Commission’s entire regulatory scheme treated broadcasted images and words interchangeably for purposes of determining indecency. Therefore, it follows that the Commission’s exception for fleeting material under that regulatory scheme likewise treated images and words alike. Three decades of FCC action support this conclusion. Accordingly, we find the FCC’s conclusion on this issue, even as an interpretation of its own policies and precedent, “counter to the evidence before the agency” and “so implausible that it could not be ascribed to a difference in view or the product of agency expertise.” State Farm, 463 U.S. at 43, 103 S.Ct. 2856.
Because the Commission fails to acknowledge that it has changed its policy on fleeting material, it is unable to comply with the requirement under State Farm that an agency supply a reasoned explana *152 tion for its departure from prior policy.[30] See id.; cf. Ramaprakash, 346 F.3d at 1125 (“[FJailure to come to grips with conflicting precedent constitutes an [agency’s] inexcusable departure from the essential requirement of reasoned decision making.”); LeMoyne-Owen College v. NLRB, 357 F.3d 55, 61 (D.C.Cir.2004) (Roberts, J.) (“[W]here, as here, a party makes a significant showing that analogous cases have been decided differently, the agency must do more than simply ignore that argument. ... The need for an explanation is particularly acute when an agency is applying a multi-factor test through case-by-case adjudication.”). Consequently, the FCC’s new policy of including fleeting images within the scope of actionable indecency is arbitrary and capricious under State Farm and the Administrative Procedure Act, and therefore invalid as applied to CBS.
IV.
In finding CBS liable for a forfeiture penalty, the FCC arbitrarily and capriciously departed from its prior policy excepting fleeting broadcast material from the scope of actionable indecency. Therefore, we will grant CBS’s petition for review and will vacate the Commission’s order in its entirety.

. Our original opinion in this matter provided additional factual and procedural background. See CBS Corp., 535 F.3d at 171-74.

. The FCC abandoned its “restrained enforcement policy for fleeting broadcast material,” at least as it applied to fleeting expletives, in its March 2004 order in In re Complaints Against Various Broadcast Licensees Regard *126 ing the Airing of the "Golden Globe Awards" Program, 19 F.C.C.R. 4975 (2004) (“Golden Globes"). See CBS Corp., 535 F.3d at 180. Because that policy change post-dated the February 2004 broadcast at issue in this case, it cannot serve as the basis for the penalty imposed on CBS. See id. at 180-81.

. In this regard, the Supreme Court noted that, in the orders at issue in Fox:
The Commission forthrightly acknowledged that its recent actions have broken new ground, taking account of inconsistent “pri- or Commission and staff action” and explicitly disavowing them as "no longer good law.” Golden Globes, 19 F.C.C.R. at 4980.... There is no doubt that the Commission knew it was making a change. That is why it declined to assess penalties; and it relied on the Golden Globes Order as removing any lingering doubt. Remand Order, 21 F.C.C.R. at 13308.
Fox, 129 S.Ct. at 1812.

. The full text of the relevant paragraph from Pacifica Foundation is as follows:
While speech that is indecent must involve more than an isolated use of an offensive word ..., repetitive use of specific words or phrases is not an absolute requirement for a finding of indecency. If a complaint focuses solely on the use of expletives, we believe that under the legal standards set forth in Pacifica, deliberate and repetitive use in a patently offensive manner is a requisite to a finding of indecency. When a complaint goes beyond the use of expletives, however, repetition of specific words or phrases is not necessarily an element critical to a determination of indecency. Rather, speech involving the description or depiction of sexual or excretory functions must be examined in context to determine whether it is patently offensive under contemporary community standards applicable to the broadcast medium. The mere fact that specific words or p.hrases are not repeated does not mandate a finding that material that is otherwise patently offensive to the broadcast medium is not indecent.
2 F.C.C.R. at 2699 ¶ 13 (emphases added).

. Our dissenting colleague contends that the Supreme Court’s omission of any discussion of fleeting images in Fox “strongly suggests” that images never fell within the FCC’s fleeting-material policy. Dissenting op. at 165. By contrast, we are unwilling to read the Court's silence as overruling our conclusion, based on a careful review of three decades of FCC precedent to discern the agency’s policy on precisely this issue, that the FCC historically did not distinguish between fleeting images and words. See 535 F.3d at 188 ("[T]he Commission’s entire regulatory scheme treated broadcasted images and words interchangeably for purposes of determining indecency. Therefore, it follows that the Commission’s exception for fleeting material under that regulatory scheme likewise treated words and images alike.”). Images simply were not involved in the case.

. See Fox, 129 S.Ct. at 1806, and CBS Corp., 535 F.3d at 175, for additional background on the Carlin monologue.

. Pacifica Foundation concerned a radio station's airing of a program entitled "Shock-time America," which allegedly contained a narration and song lyrics using words and phrases such as "eat shit," "mother-fucker," and "fuck the U.S.A.,” and a program featuring excerpts from a play with dramatic readings of sexual fantasies and containing language highly descriptive of sexual and excretory activities. Pacifica defended that the Shocktime remarks were not scripted, and asserted that the language of the play was taken out of context and the broadcast was at night when children would not be listening.

.Interestingly, we cited this exact language as evidence of the FCC's "restrained enforcement policy” for fleeting indecent material in our earlier opinion. See CBS Corp., 535 F.3d at 177.

. Just as Young Broadcasting did not mention Pacifica Foundation's literal/non-literal distinction, Fox does not reference or attempt to reconcile Young Broadcasting, confirming that the Court did not consider, much less decide, whether the FCC's pre-Golden Globes fleeting-material policy applied to images as well as words.

. Our prior opinion chronicled that history at length. As we discussed:
*134 The Commission’s conclusion on the nature and scope of its indecency regime-including its fleeting material policy — is at odds with the history of its actions in regulating indecent broadcasts. In the nearly three decades between the Supreme Court’s ruling in Pacifica Foundation and CBS’s broadcast of the Halftime Show, the FCC had never varied its approach to indecency regulation based on the format of broadcasted content. Instead, the FCC consistently applied identical standards and engaged in identical analyses when reviewing complaints of potential indecency whether the complaints were based on words or images.
CBS Corp., 535 F.3d at 184.

. We incorporate the pertinent portions of our previous opinion as they were filed on July 21, 2008 and amended on August 6, 2008. Thus, the citation information in Part B of our opinion is current as-of that date and does not reflect any subsequent updates.

. At that time, both CBS and MTV Networks were divisions of Viacom, Inc.

. The record is unclear on the actual number of complaints received from unorganized, individual viewers. In its brief, the FCC asserts it received " 'an unprecedented number’ of complaints about the nudity broadcast during the halftime show.” FCC Br. at 12 (citation omitted). CBS disputes the calculation and significance of the viewer complaints. See CBS Reply Br. at 15 n.6 ("Of the 'over 542,000 complaints concerning the broadcast' the FCC claims to have received, over 85 percent are form complaints generated by single-interest groups. Approximately twenty percent of the complaints are duplicates, with some individual complaints appearing in the record up to 37 times.” (citations omitted)).

.This figure represented the aggregate of proposed penalties against individual CBS stations. At the time the Commission issued its Notice of Apparent Liability, forfeiture penalties for indecency violations were statutorily capped at $27,500. The Commission proposed the maximum penalty for each CBS station.

. This section of the Communications Act provides: "The term 'willful', when used with reference to the commission or omission of any act, means the conscious and deliberate commission or omission of such act, irrespective of any intent to violate any provision of this Act or any rule or regulation of the Commission authorized by this Act or by a treaty ratified by the United States." 47 U.S.C. § 312(f)(1).

. See 47 U.S.C. § 326 ("Nothing in this chapter shall be understood or construed to give the Commission the power of censorship over the radio communications or signals transmitted by any radio station, and no regulation or condition shall be promulgated or fixed by the Commission which shall interfere with the right of free speech by means of radio communication.”).

. See 47 U.S.C. § 503(b)(1)(D) ("Any person who is determined by the Commission ... to have ... violated any provision of section ... 1464 of title 18 ... shall be liable to the United States for a forfeiture penalty.”).

. See In re Infinity Broad. Corp., 3 F.C.C.R. 930, ¶ 5 (1987), vacated in part on other grounds, Action for Children’s Television v. FCC, 852 F.2d 1332, 1337 (D.C.Cir.1988) (“ACT I"), superseded by Action for Children's Television v. FCC, 58 F.3d 654 (D.C.Cir.1995) (en banc) (“ACT II ”).

. As described in greater detail infra, subsequent litigation determined what time of day broadcasters could reasonably air indecent programming without expecting children to be in the audience. The D.C. Circuit Court of Appeals rejected a total ban on indecency, instructing the FCC to identify a precise time period during which broadcasters could air indecent material. See ACT I, supra. In response, the Commission adopted the safe-harbor rule of 47 C.F.R. § 73.3999. After further instruction from the D.C. Circuit in 1995, ACT II, supra, the Rule was amended to its current form, which confines enforcement of indecency restrictions to the hours "between 6:00 a.m. and 10:00 p.m.” See 47 C.F.R. § 73.3999; In re Enforcement of Prohibitions Against Broadcast Indecency in 18 U.S.C. § 1464, 10 F.C.C.R. 10558 (1995).

. The Commission also cited Trinity Broad. of Fla., Inc. v. FCC, 211 F.3d 618 (D.C.Cir.2000), explaining that the court in Trinity "reversed [a] Commission decision that denied a renewal application for abuse of process in connection with the Commission’s minority ownership rules because the court found the Commission had not provided sufficiently clear notice of what those rules required.’’ Golden Globes at ¶ 15 n. 40.

. In its 2001 policy statement, the Commission described the "principal factors that have proved significant in [its] decisions to date” as: "(1) the explicitness or graphic nature of the description or depiction of sexual or excretory organs or activities; (2) whether the material dwells on or repeats at length descriptions of sexual or excretory organs or activities; (3) whether the material appears to pander or is used to titillate, or whether the material appears to have been presented for its shock value.” Industry Guidance at ¶ 10 (em *143 phasis in original). It has since contended that its fleeting material policy was no policy at all, asserting instead that the fleeting nature of material was only a consideration under the second factor and could be outweighed by the other two factors depending on the specific facts of a case. But as we detail infra, this assertion contradicts the history of the Commission’s indecency enforcement regime and is foreclosed by the agency’s admissions in Golden Globes and Fox, which are controlling here, that its prior policy was to exclude fleeting material from the scope of actionable indecency. Although the FCC disputes the breadth of its policy, now contending the policy was limited only to fleeting expletives or alternatively to fleeting utterances, the fleeting nature of broadcast material was unquestionably treated by the FCC as more than one of several contextual factors subject to balancing.

. The WEZB-FM NAL found a broadcast licensee apparently liable for a forfeiture penalty of $12,000 for its broadcast of indecent material during six radio broadcasts spanning fourteen hours of airtime over nearly a one year period. The WEZB-FM NAL provides transcript excerpts from these broadcasts, which involved very graphic segments discussing a variety of sexual topics in extended detail. The “announcer joke” included in the FCC’s Industry Guidance was merely one of these factual predicates for the broadcast licensee’s forfeiture liability for indecency.

. It was undisputed that the FCC changed its policy on fleeting expletives in Golden Globes, which was decided prior to Fox. But as the Fox court explained, the actual moment the agency changed its course was not pertinent in determining whether the change was valid under State Farm:
[W]e ... reject the FCC’s contention that our review here is narrowly confined to the specific question of whether the two Fox broadcasts ... were indecent. The \Fox Remand Order\ applies the policy announced in Golden Globes. If that policy is invalid, then we cannot sustain the indecency findings against Fox. Thus, as the Commission conceded during oral argument, the validity of the new "fleeting expletive” policy announced in Golden Globes and applied in the [Fox Remand Order] is a question properly before us on this petition for review.
Fox, 489 F.3d at 454. To hold otherwise would create a situation ripe for manipulation by an agency. Cf. ACT I, supra, 852 F.2d at 1337 ("[A]n agency may not resort to [ad hoc] adjudication as a means of insulating a generic standard from judicial review.”).

. The FCC’s position is difficult to reconcile with the source of its authority to regulate broadcast content. The text of 18 U.S.C. § 1464 provides: "Whoever utters any obscene, indecent, or profane language by means of radio communication shall be fined under this title or imprisoned not more than two years, or both.” Id. (emphasis added). Although the text on its face only reaches spoken words, it is applied broadly, as here, to reach all varieties of indecent content. But this broad interpretation of the text requires that the FCC treat words and images interchangeably in order to fit its regulation of indecent images within the boundaries of its statutory authority. Where the FCC’s entire enforcement regime is built on the agency’s treatment of words and images as functionally identical, it is unclear how the difference between words and images is "obvious.” At minimum, the FCC cannot reasonably expect the difference between words and images to be so self-evident that broadcast licensees seeking to comply with indecency standards would interpret FCC enforcement orders narrowly based on whether the reviewed content consisted of words or images.

. Among several broadcasts at issue in WGBH were: (1) "numerous episodes of Monty Python’s Flying Circus, which allegedly consistently relie[d] primarily on scatology, immodesty, vulgarity, nudity, profanity and sacrilege for humor”; (2) "a program entitled Rock Follies ... which [the petitioner] described] as vulgar and as containing profanity” including "obscenities such as shit, bullshit, etc., and action indicating some sexually-oriented content in the program”; and (3) "other programs which allegedly contained nudity and/or sexually-oriented material.” 69 F.C.C.2d 1250 at ¶ 2 (internal quotation marks omitted).

. The FCC contends WGBH is inapposite because it was a license revocation proceeding rather than a direct complaint for indecency. But its analysis in reaching its decision is instructive. Because the complainant in WGBH challenged the broadcaster's license based on a pattern of allegedly indecent broadcasts, the Commission expressly answered the threshold question of whether the broadcasts were indecent. Separate from the question of whether the broadcaster’s actions were sufficient to revoke its license, the Commission’s analysis illustrates that "words” and "depictions” were treated identically for purposes of determining whether a broadcast was actionably indecent.

. Several statements in the FCC's own press release announcing the Young Broadcasting Notice of Apparent Liability belie the agency's contention here that Young Broadcasting accorded with its prior policies. See Press Release, FCC, Com m’ n Proposes to Fine Young Broadcasting of San Francisco, Inc., Statutory Maximum for Apparent Violation of Indecency Rules (Jan. 27, 2004) (statement of Chairman Michael K. Powell: “Today, we open another front in our increased efforts to curb indecency on our nation’s airwaves....”); id. (statement of Commissioner Michael J. Copps: “I am pleased that this Commission is finally taking an initial step against indecency on television.”); id. (statement of Commissioner Kevin J. Martin: "I hope that this step today represents the beginning of a commitment to consider each indecency complaint seriously....”).

. One of the cases the FCC distinguished in Young Broadcasting was its Notice of Apparent Liability in Flambo Broadcasting, Inc. (KFMH-FM), 9 F.C.C.R. 1681 (MMB 1994), which involved "a radio station's broadcast of sexual material in a crude joke” that was not found actionably indecent. Young Broadcasting at ¶ 12 n. 35. As with the other cases it discussed in its Young Broadcasting Notice of Apparent Liability, the FCC did not draw any distinction between Young Broadcasting and Flambo Broadcasting based on the subject material there being words or images. But it did distinguish the two notices of apparent liability in part because: "assuming that the joke [at issue in Flambo Broadcasting] was cut off immediately, the staff of the then-Mass Media Bureau found that it would not have been actionably indecent because it was brief, live, unscripted and from an outside source." Young Broadcasting at ¶ 12 n. 35 (emphasis added). Notably, the facts here — a brief image of a bare female breast during the live Halftime Show broadcast resulting from an unscripted stunt by Jackson and Timberlake— are remarkably similar to the Flambo Broadcasting fact pattern that the FCC found readily distinguishable from the actionably indecent material in Young Broadcasting.

. Young Broadcasting was a notice of apparent liability, which is non-final until the implicated licensee either declines to dispute the findings in the notice or the licensee's responsive opposition is fully adjudicated. See FCC Br. at 13 (describing content of CBS Notice of Apparent Liability as "tentative conclusions”); see also 47 U.S.C. § 504(c) ("In any case where the Commission issues a notice of apparent liability looking toward the imposition of a forfeiture under this chapter, that fact shall not be used, in any other proceeding before the Commission, to the prejudice of the person to whom such notice was issued, unless (i) the forfeiture has been paid, or (ii) a court of competent jurisdiction has ordered payment of such forfeiture, and such order has become final.”). At the time the Commission issued its Reconsideration Order against CBS and after its determination in Golden Globes, the question of whether the broadcast licensee in Young Broadcasting would contest the Notice of Apparent Liability in that case was still unresolved. See Reconsideration Order at ¶ 6 n. 25 (indicating the status of the Young Broadcasting Notice of Apparent Liability as "response pending” at the time of the Reconsideration Order’s issuance).

. In its brief and at oral argument, the Commission continues to assert it has not changed its policy on fleeting material, yet it also suggests several reasons why a policy including fleeting images within the scope of actionable indecency is reasonable. But see State Farm, 463 U.S. at 50, 103 S.Ct. 2856 ("[T]he courts may not accept appellate counsel’s post hoc rationalizations for agency action. It is well-established that an agency’s action must be upheld, if at all, on the basis articulated by the agency itself." (internal citations omitted)).